# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY WHITE, et al., | Case No. 1:18-cv-01206-DAD-SAB |
| Plaintiffs, | FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING IN PART |
| v. | AND DENYING IN PART DEFENDANTS COUNTY OF STANISLAUS, ANGELA |
| COUNTY OF STANISLAUS, et al., | KELLEY, MELODY TRANTHAM, SALVADOR PEREZ, AND ANACANI |
| Defendants. | ROCHA'S MOTION TO DISMISS |
| | (ECF Nos. 34, 38, 41) |
| | OBJECTIONS DUE WITHIN FOURTEEN DAYS |

Anthony White and minors A.L.W. and A.W., by and through their guardians ad litem, (collectively "Plaintiffs") brought this civil rights action pursuant to 42 U.S.C. § 1983. Currently before the Court is County of Stanislaus, Angela Kelley, Melody Trantham, Salvador Perez, and Anacani Rocha (collectively "Defendants") motion to dismiss the first amended complaint, which was referred to the United States magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.

The Court heard oral argument on April 3, 2019. Counsel Ayman Mourad appeared telephonically for Plaintiffs, and counsel Taylor Rhoan appeared telephonically for Defendants. Having considered the moving, opposition and reply papers, the declarations and exhibits attached thereto, arguments presented at the April 3, 2019 hearing, as well as the Court's file, the

Court issues the following findings and recommendations.

## I.

## PROCEDURAL HISTORY

Plaintiffs filed the complaint in this action on September 4, 2018. (ECF No. 1.) On September 18, 2018, District Judge Dale A. Drozd appointed David Brooks as guardian ad litem for minors A.W. and A.L.W. (ECF No. 8.) On November 8, 2018, Defendants filed a motion to dismiss. (ECF No. 19.) On December 3, 2018, Plaintiffs' filed a first amended complaint which was stricken from the record as untimely. (ECF No. 21.) On December 17, 2019, the motion to dismiss was denied as moot due to the stipulation to file an amended complaint. (ECF No. 23.)

The parties filed a stipulation for Plaintiffs to file an amended complaint which was granted on January 14, 2019. (ECF Nos. 24, 25.) On January 14, 2019, Plaintiffs filed a first amended complaint. (ECF No. 28.) On January 25, 2019, Plaintiffs filed a notice of withdrawal of the first amended complaint and filed an amended complaint using an incorrect docket entry. (ECF Nos. 29, 30.) On January 28, 2019, an order issued disregarding the first amended complaint filed January 14, 2019, and the amended document. (ECF No. 31.) Plaintiffs were ordered to file their first amended complaint using the correct docket entry. (Id.)

On January 28, 2018, Plaintiffs filed their first amended complaint. (ECF No. 32.) On January 29, 2019, a motion to withdraw as attorney for Plaintiffs was filed. (ECF No. 33.) On January 30, 2019, Defendants filed the instant motion to dismiss. (ECF No. 34.) Plaintiffs filed an opposition to the motion to dismiss on March 5, 2019. (ECF No. 38.) On March 12, 2019, Defendants filed a reply to Plaintiffs' opposition. (ECF No. 41.) On March 21, 2019, the motion to dismiss was referred to the undersigned. (ECF No. 42.)

## II.

## ALLEGATIONS IN FIRST AMENDED COMPLAINT

Plaintiff Anthony White ("Anthony") is the biological father of minor plaintiffs A.L.W. and A.W. (First Am. Compl. ("FAC") ¶ 28, ECF No. 32.) Around September 26, 2015, Justene Obrentz ("Obrentz"), A.L.W.'s mother, took A.L.W. to the hospital to have her examined regarding allegations of sexual abuse. (FAC ¶ 30.) Around September 28, 2015, CSA social

workers Miller and Padilla went to A.L.W.'s school to interview her but were informed by school staff that A.L.W. was absent that day. Later that day, social workers located A.L.W. at a local hospital. Obrentz did not give her consent to have the social workers interview A.L.W. (FAC ¶ 31.)

Around October 19, 2015, A.L.W. and Obrentz met with social workers, Defendant Perez and Ana Diaz. Obrentz informed the social workers that they did not have her permission interview A.L.W. at her school. (FAC ¶ 32.)

In February 2016, A.L.W. was living with Obrentz. On February 3, 2016, law enforcement responded to the home due to a neighbor complaint that Obrentz was arguing with her boyfriend. The police officers made no arrest and determined that there was no basis to place A.L.W. into protective custody but they did make a referral to CSA. (FAC ¶ 33.) In violation of California Welfare and Institution Code section 16501(a)(8)(f), the first contact with A.L.W. occurred on February 16, 2016. (FAC ¶ 34.) On February 16, 2016, without a court order or parental consent, Defendant Trantham went to A.L.W.'s school. (FAC ¶ 35.) Defendant Trantham removed A.L.W. from her class and interviewed her in violation of Obrentz' statement that she did not give her permission for A.L.W. to be interviewed at school. (FAC ¶¶ 35, 36.) Defendant Trantham did not ask A.L.W. about the name and identity of her father. (FAC ¶ 37.) A.L.W. was not informed that she could refuse to speak to the social worker or that she could have an attorney or parent present during the interview. (FAC ¶ 38.). When Obrentz found out that A.L.W. had been interviewed at school, she called and complained to Defendant Trantham. (FAC ¶ 39.)

On February 23, 2016, a meeting was held at CSA to discuss A.L.W. Defendants Rocha, Trantham, and Perez attended the meeting and made the decision that A.L.W. would be removed from her mother's care. (FAC ¶ 40.) On this same date, despite no evidence that A.L.W. was in imminent risk of serious bodily injury, Defendants Trantham and Perez removed A.L.W. from her mother's home and placed her in foster care. (FAC ¶ 41.)

Around February 26, 2016, Defendant Rocha drafted a detention report in concert with Defendants Trantham and Perez. (FAC ¶ 42.) Defendant Rocha informed the juvenile court that

Obrentz had indicated that she did not know the identity of A.L.W.'s father despite the fact that Obrentz did know Anthony's name and whereabouts. Defendant Rocha did not indicate that she had taken any action to locate A.L.W.'s father. (FAC ¶ 43.)

Defendants Rocha, Trantham, and Perez did not ask A.L.W. who her father was nor did they cross check for evidence of who the father was in prior child abuse referrals that were cited in the detention report. Defendants Rocha, Trantham, and Perez did not complete a due diligent search under California Welfare and Institution Code section 294 for the identity of A.L.W.'s father. (FAC ¶ 44.)

A.L.W. was placed in foster care on February 23, 2016. Despite being required by California law to visit her three times in the first thirty days and once each calendar month, there is no documented contact with A.L.W. or her foster parents until May 2, 2016. This contact was actually made by a Foster Family Agency social worker and not a CSA social worker. (FAC ¶ 46.)

About March 14, 2016, CSA social workers received a referral that A.L.W. had woken up in the morning with blood in her private parts, but they choose not to investigate. (FAC ¶ 47.)

On May 11, 2016, Defendant Rocha contacted relatives for a possible placement for A.L.W. but did not question the relatives as to the identity of A.L.W.'s father. (FAC ¶ 48.) On May 24, 2016, social worker Johnson met with A.L.W. who informed her how to find her father. (FAC ¶ 49.)

A.L.W. was declared a dependent of the court on June 6, 2016, and by court order was placed in the legal custody of CSA and the County. (FAC ¶ 50.) On June 27, 2016, A.L.W. informed social worker Johnson that her father's name was Anthony and he lived on the west side of Modesto. (FAC ¶ 51.) On July 11, 2016, A.L.W. asked a Foster Family Agency social worker if CSA had found her father as she wanted to visit him. A.L.W. told the social worker that her mother and step-father know Anthony and where he is even though they claim they do not. (FAC ¶ 52.) On July 21, 2016, Anthony learned from a relative that A.L.W. was in foster care and he immediately contacted Defendant Renzi. (FAC ¶ 53.)

A.L.W. was placed in four different foster homes prior to being reunited with her father.

(FAC ¶ 54.)  The first home had a foster mother, foster father, and their three biological children.  Defendants failed to monitor A.L.W.'s care in this foster placement.  (FAC ¶ 55.)  During A.L.W.'s placement in this foster home, one of the biological daughters engaged in inappropriate sexual activity with A.L.W. on at least two occasions.  (FAC ¶ 56.)  When the foster mother learned of the inappropriate sexual behavior, she immediately contacted CSA and A.L.W. was removed from the home that same day.  (FAC ¶ 57.)  An unknown social worker who removed A.L.W. from the home never asked A.L.W. what had occurred in the foster home.  The County did not report the sexual misconduct to A.L.W.'s parents, the juvenile court, or Community Care Licensing.  The County did not provide A.L.W. with treatment to address the sexual misconduct.  (FAC ¶ 58.)

A.L.W. was placed in a second foster home in which she was the only child for a short period of time.  (FAC ¶ 62.)  Defendant Renzi was A.L.W.'s social worker at the time that A.L.W. was placed in the third foster home.  (FAC ¶ 63.)  Defendant Renzi asked A.L.W. what had occurred in the first foster home.  (FAC ¶ 64.)  A.L.W. disclosed to Defendant Renzi that she had witnessed sexual misconduct including seeing the foster mother's daughter insert a barbie doll into her private parts.  Defendant Renzi told A.L.W. not to tell anyone else what had happened to her at the first foster home.  A.L.W. was so frightened by Defendant Renzi's response that she did not ask why she could not talk about what had happened.  Defendant Renzi did not document this contact with A.L.W. in the system.  (FAC ¶ 65.)  Defendants County, Renzi, and Kelly never completed an appraisal needs and services plan including the sexual misconduct and outlining A.L.W.'s therapeutic needs.  (FAC ¶ 66.)  A.L.W.'s third foster parents ran a day care out of their home.  Defendants County and Renzi did not provide A.L.W.'s foster parents with a notice warning them of A.L.W.'s prior sexual activity.  (FAC ¶ 68.)

Several months later, after A.L.W. had a supervised visit with Obrentz, Defendant Renzi spoke with A.L.W. about the sexual misconduct and again told A.L.W. not to talk about the incidents of sexual misconduct.  Again, Defendant Renzi did not document this contact in the system.  (FAC ¶ 69.)

While in her third foster care placement, A.L.W. started counseling with Ashley Boyd

from Clinical Stanislaus Behavioral Health & Recovery Services ("BHRS"). BHRS provides in home therapeutic services to child and youth with serious emotional disturbance. Between August 26, 2016, and October 27, 2016, A.L.W. received fourteen counseling sessions. Defendants County, Renzi, and Kelley did not document or report why A.L.W. required this level of in-home services. (FAC ¶ 70.)

On August 8, 2016, Defendant Renzi noted that she had instructed A.L.W. not to disclose to her mother that she was having contact and visitation with her father. (FAC ¶ 71.)

On October 12, 2016, Obrentz made a formal complaint to Defendant Kelley regarding Defendant Renzi's handling of A.L.W.'s case. (FAC ¶ 72.) On October 13, 2016, Defendant Renzi submitted a report to the juvenile judge regarding Anthony's home as a potential placement for A.L.W. Despite there being no documented assessment, Defendant Renzi stated that she had assessed the placement and could not support placing A.L.W. in Anthony's home. (FAC ¶ 73.) Around October 28, 2016, a referral for neglect and abuse was received by social worker Margarita Zamora regarding the foster home and care of A.L.W. The allegations were not provided to Community Care Licensing who have an obligation to investigate such claims. (FAC ¶ 74.)

In a six-month review on November 15, 2016, Defendants Renzi and Kelley stated that the basis for A.L.W.'s therapy was for her to be open in sharing her fears and anxiety and to overcome her need to please, deliberately misleading the juvenile court regarding the reason for the therapy and to cover up the sexual misconduct and their liability. (FAC ¶ 75.)

On February 9, 2017, CSA received another referral of neglect or abuse concerning the foster home where A.L.W. was placed. Again, these allegations were not reported to Community Care Licensing. (FAC ¶ 77.)

Anthony met A.L.W.'s new social worker, L.C. Garrett on February 16, 2017. When Anthony asked Mr. Garrett why a new social worker had been assigned, Mr. Garrett informed him that he was cleaning up Defendant Renzi's mess. Mr. Garrett also told Anthony that Defendant Renzi had not been documenting her cases and had been illegally removing children from their parents. (FAC ¶ 78.)

On May 12, 2017, the juvenile judge made a lack of reasonable services finding against CSA for the period of December 5, 2016 through March 15, 2017. (FAC ¶ 79.)

On May 20, 2017, A.L.W. started having weekend overnight visits with Anthony. At this time, Anthony was living with his wife and two of his biological children. A.W., who was five years old, was residing in the home. (FAC ¶ 80.)

Around July 2017, the mother of A.W. informed Anthony that A.L.W. had sexually abused A.W. (FAC ¶ 84.) Anthony immediately informed Mr. Garrett. Anthony believed that something must have happened while A.L.W. was in foster care. (FAC ¶ 85.)

Around this time, A.L.W.'s therapist, Ms. Boyd, contacted Anthony to reengage A.L.W. in therapy sessions. Ms. Boyd told Anthony that she had previously met with A.L.W. for similar sexual abuse and sexual misconduct issues. Ms. Boyd would not disclose to Anthony what A.L.W. had told her. (FAC ¶ 86.)

On August 17, 2017, in an eighteen-month review report, Mr. Garrett recommended that A.L.W. begin an extended trial visit with Anthony. At this time, A.L.W. was in foster placement with her maternal aunt. (FAC ¶ 87.) On August 19, 2017, A.L.W. was placed with Anthony on an extended visit. (FAC ¶ 88.) On October 19, 2017, A.L.W. was placed in Anthony's home. (FAC ¶ 89.)

Mr. Garrett left his employment as a social worker with the County in October 2017, and told Anthony that everyone was against him and that he should sue the County. Mr. Garrett said that he was leaving his employment with the County because he felt he was hurting people more than he was helping. (FAC ¶ 90.)

On April 17, 2018, A.L.W.'s dependency case was dismissed and Anthony was granted sole legal and physical custody of A.L.W. (FAC ¶ 92.) On May 18, 2018, after the dependency case was dismissed, Ms. Laster, a social worker, interviewed A.L.W. at school without consent. (FAC ¶ 94.) After interviewing A.L.W., Ms. Laster went to Anthony's home and informed him about the interview. Ms. Laster indicated that she was unaware that there had been a prior dependency case for A.L.W. (FAC ¶ 96.) Later that day, Ms. Laster closed the referral after discovering that it had been previously investigated in 2017. (FAC ¶ 97.)

This action is brought by 1) A.L.W. against Defendants Trantham, Perez, Rocha, and Renzi alleging violation of the Fourth Amendment; 2) all Plaintiffs against Defendant Renzi, Kelley and Rocha for deprivation of due process in violation of the Fourteenth Amendment; 3) Anthony and A.L.W. against Defendants Renzi and Kelly for deprivation of due process by deception in evidence presented to the juvenile court; 4) all Plaintiffs against the County for unlawful customs and practices; 5) all Plaintiffs against Defendants County and Renzi for intentional infliction of emotional distress; 6) all Plaintiffs against Defendants County, Renzi, Kelley, and Rocha for negligence; and 7) Plaintiffs A.L.W. and Anthony against the County for injunctive relief. Plaintiffs seek monetary damages.

### III.

### LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss on the grounds that a complaint "fail[s] to state a claim upon which relief can be granted." A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint. Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). In deciding a motion to dismiss, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337–38 (9th Cir. 1996). The pleading standard under Rule 8 of the Federal Rules of Civil Procedure does not require " 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In assessing the sufficiency of a complaint, all well-pleaded factual allegations must be accepted as true. Iqbal, 556 U.S. at 678-79. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. To avoid a dismissal under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570.

In deciding whether a complaint states a claim, the Ninth Circuit has found that two principles apply. First, to be entitled to the presumption of truth the allegations in the complaint

"may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011). Second, so that it is not unfair to require the defendant to be subjected to the expenses associated with discovery and continued litigation, the factual allegations of the complaint, which are taken as true, must plausibly suggest an entitlement to relief. Starr, 652 F.3d at 1216. "Dismissal is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." Navarro, 250 F.3d at 732 (citing Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir.1988)).

## IV.

## DISCUSSION

### A.    Arguments of the Parties

Defendants move to dismiss the second claim for violation of due process on the ground that it fails as a matter of law. Defendants contend Defendant Anthony has no standing to assert the due process claim because he was not granted custody of A.L.W until June 2017 and the alleged sexual misconduct occurred prior to his obtaining custody. Further, Defendants argue that there are no allegations that any Defendant was aware of a risk due to placing A.L.W. in the first foster home and without a known prior risk there is no basis for liability. Defendants argue that Plaintiffs admit that immediate action was taken upon the report that inappropriate sexual conduct occurred.

Defendants also contend that the third claim for violation of due process fails because Plaintiff Anthony has no standing to assert the claim and that social workers have absolute immunity when they make discretionary decisions to institute dependency proceedings.

Defendants argue that Plaintiffs have failed to allege sufficient facts to state a Monell claim against the County. Defendants contend that Plaintiffs have included conclusions, but not facts to support a custom or policy claim against the County.

Defendants state that due to the shotgun style of the pleadings it is unclear what the basis of the intentional infliction of emotional distress claim would be. Therefore, Defendants seek to

have this claim dismissed.

Similarly, Defendants argue that although Plaintiffs list a host of "mandatory duties", they fail to include allegations of what any defendant is claimed to have breached to state a claim for negligence.

Finally, Defendants move to the dismiss the claim for injunctive relief as it is a remedy and not a cause of action.

Plaintiffs counter that they have presented evidence that A.L.W. suffered sexual misconduct at the hands of her foster mother and that Defendants were aware or suspected that this home would pose a danger to A.L.W. which is sufficient to satisfy the pleading standard.

Plaintiffs contends that the social workers are not entitled to absolute immunity because they were not fulfilling quasi-prosecutorial functions.

Plaintiffs contend that they have submitted sufficient facts that there was a failure to provide adequate training or supervision that resulted in constitutional violations. Plaintiffs also argue that they have pled sufficient facts to state an intentional infliction of emotional distress and negligence claim. Plaintiffs state that the claim for injunctive relief is proper as A.L.W. was still subject to the unconstitutional interviews after the end of her dependency case.

Finally, Plaintiffs counter that Anthony, as the noncustodial parent, has standing to bring this lawsuit.

Defendants reply that Defendant Renzi is not a moving party to the motion to dismiss the due process claims, and therefore, Plaintiffs' arguments that focus on her involvement cannot save the claims. Defendants contend that Plaintiffs' complaint contains only speculation of prior knowledge that is insufficient to show deliberate indifference in placing A.L.W. in the first foster home.

Defendants contend that Plaintiffs merely repeat their conclusory allegations of knowingly presenting false evidence regarding Anthony and are the victim of inconsistent pleading. Although Plaintiffs allege that Anthony was barred from receiving custody, he has plead that he received custody of A.L.W. on April 17, 2018.

Defendants assert that the Court should reject Plaintiffs' arguments regarding a custom or

policy that are based on state law procedures and not federal violations. Defendants continue to assert that Plaintiffs have failed to plead what information was fabricated in order to present a pattern or practice claim.

Defendants contend that the allegations in the complaint are insufficient to provide notice of the intentional infliction of emotional distress claim and have failed to allege outrageous conduct. As to the negligence claim, Defendants contend that Plaintiffs fail to understand the scope of the motion or their obligation to set forth whether the sections relied on impose a mandatory duty, as opposed to a discretionary duty, are intended to protect against the risk of the injury suffered and that the breach must be the proximate cause of the injury. Defendants reply that Plaintiffs are misreading the authority that injunctive relief can be pled as a claim rather than as a prayer for relief.

Finally, Defendants contend that Plaintiffs are mischaracterizing the holding in <u>Newdow v. U.S. Congress</u>, 313 F.3d 500, 503-04 (9th Cir. 2002), in arguing standing. Defendants argue that <u>Newdow</u> is distinguishable as Anthony had no legal or custodial rights until he was granted custody in June 2017.

**B.    Standing**

Defendants contend that Anthony does not have standing to assert a due process claim based on the removal of A.L.W. from her mother's custody and placement of A.L.W. in the foster care home because he did not have custody of her until June 2017. Relying on <u>Newdow</u>, Plaintiffs argue that a noncustodial parent who holds some parental rights may maintain a federal lawsuit. Plaintiffs contend that Anthony had a fundamental right to the care and custody of all his biological children. Defendants counter that Plaintiffs are mischaracterizing the holding in <u>Newdow</u> which held that the noncustodial parent retains parental rights that are not legally incompatible with the custodial parent's rights. Defendants argue that <u>Newdow</u> is distinguishable because Newdow retained parental rights of the type that were at issue in the lawsuit.

Standing derives "[f]rom Article III's limitation of the judicial power to resolving 'Cases' and 'Controversies,' and the separation-of-powers principles underlying that limitation[.]"

1 Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 125 (2014); see also

2 DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006) ("the case-or-controversy limitation is

3 crucial in maintaining the 'tripartite allocation of power' set forth in the Constitution"); Lujan v.

4 Defs. of Wildlife, 504 U.S. 555, 560 (1992) ("standing is an essential and unchanging part of the

5 case-or-controversy requirement of Article III"). "In essence the question of standing is whether

6 the litigant is entitled to have the court decide the merits of the dispute or of particular issues."

7 Allen v. Wright, 468 U.S. 737, 750-51 (1984), abrogated on other grounds by Lexmark Int'l,

8 Inc., 572 U.S. 118) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)). Standing raises both

9 constitutional and prudential concerns incident to the federal court's exercise of jurisdiction.

10 Coalition of Clergy, Lawyers, and Professionals v. Bush, 310 F.3d 1153, 1157 (9th Cir. 2002).

11 "The core component of standing is an essential and unchanging part of the case-or-

12 controversy requirement of Article III." Lujan, 504 U.S. at 560. To have constitutional standing

13 to bring suit, a "plaintiff must have suffered or be imminently threatened with a concrete and

14 particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and

15 likely to be redressed by a favorable judicial decision." Lexmark Int'l, Inc., 572 U.S. at 125;

16 accord DaimlerChrysler Corp., 547 U.S. at 342; Lujan, 310 F.3d at 560.

17 The injury asserted must be "distinct and palpable" and not "abstract" or "conjectural" or

18 "hypothetical." Allen, 468 U.S. at 751 (citations omitted). "In many cases the standing question

19 can be answered chiefly by comparing the allegations of the particular complaint to those made

20 in prior standing cases." Id. at 751-52. An allegation that an individual has a right to a particular

21 kind of government conduct and that the government has violated that right by acting differently

22 cannot alone satisfy the requirements of Article III standing. Id. at 754. "[T]he 'injury in fact'

23 test requires more than an injury to a cognizable interest. It requires that the party seeking

24 review be himself among the injured." Lujan, 504 U.S. at 563 (quoting Sierra Club v. Morton,

25 405 U.S. 727, 734-35 (1972)).

26 Here, Defendants argue that Anthony did not obtain legal or physical custody of A.L.W.

27 until June 2017, and since the alleged sexual misconduct occurred prior to that date, he had no

28 legal interest to confer standing. Defendants argued at the April 3, 2019 hearing that Newdowe

is relevant because there are no allegations in the first amended complaint that Anthony had custody of A.L.W. Defendants contend that pursuant to <u>Newdowe</u> Plaintiffs are required to plead something beyond the fact that Anthony is the father of A.L.W. to have Article III standing. However, the first amended complaint alleges that Anthony is A.L.W.'s father and there is nothing in the record that would indicate that Anthony's parental rights had been terminated or restricted.

"A parent's desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection. " <u>Lassiter v. Dep't of Soc. Servs. of Durham Cty., N. C.</u>, 452 U.S. 18, 27 (1981) (quoting <u>Stanley v. Illinois</u>, 405 U.S. 645, 651 (1972)); <u>accord Kelson v. City of Springfield</u>, 767 F.2d 651, 655 (9th Cir. 1985). "[F]reedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment." <u>Santosky v. Kramer</u>, 455 U.S. 745, 753 (1982). "A parent's right to care, custody and management of a child is a fundamental liberty interest protected by the federal Constitution that will not be disturbed except in extreme cases where a parent acts in a manner incompatible with parenthood." <u>In re Isayah C.</u>, 118 Cal.App.4th 684, 696 (2004) (quoting <u>In re Marquis D.</u>, 38 Cal.App.4th 1813, 1828 (1995)). The Supreme Court held long ago that an unwed father's interest in having custody of his children is cognizable and substantial. <u>Stanley</u>, 405 U.S. at 652.

In <u>Newdow</u>, a father brought an action challenging on Establishment Clause grounds state action that affected his child enrolled in public school. 313 F.3d at 502. At the time that the suit was brought, the parents of the child were not married and lived together part of the time and at other times lived in separate homes. <u>Id.</u> The parents had informal visiting arrangements. <u>Id.</u> After the federal case was dismissed and the father appealed, a state court order issued giving sole legal custody of the child to the mother, with the father retaining the right to consult "on substantial decisions relating to non-emergency major medical care, dental, optometry, psychological and educational needs of [the child]." <u>Id.</u> Newdow filed a motion in state court seeking joint legal custody of his child, and the state court entered an order enjoining him from pleading his daughter as an unnamed party or representing her as next friend in the federal

lawsuit.  Id.  On appeal in the federal action, the child's mother had intervened to challenge the father's standing to bring the suit.  Id. at 501-02.  Newdow was no longer claiming to represent his child in the suit, and the Ninth Circuit was considering whether a noncustodial parent had Article III standing in his own right to challenge state action that affects his child.  Id. at 501.

The Ninth Circuit held that "a noncustodial parent, who retains some parental rights, may have standing to maintain a federal lawsuit to the extent that his assertion of retained parental rights under state law is not legally incompatible with the custodial parent's assertion of rights." Newdow, 313 F.3d at 503-04.  This is assuming that "the noncustodial parent can establish an injury in fact that is fairly traceable to the challenged action, and it is likely that the injury will be redressed by a favorable decision."  Id. at 504.[1]  "[A] noncustodial parent with visitation rights may be able to state a § 1983 claim against social workers who know of abuse to his or her child in foster care and fail to respond appropriately."  Yahvah v. Cty. of Los Angeles, No. CV 17-101-MWF (AGR), 2018 WL 3222042, at *6 (C.D. Cal. Mar. 9, 2018), report and recommendation adopted, No. CV 17-101-MWF (AGR), 2018 WL 3219639 (C.D. Cal. June 29, 2018).

Here, Anthony, as A.L.W.'s father, has a fundamental right in the companionship, care, custody, and management of A.L.W.  Lassiter, 452 U.S. at 27.  Although Anthony is a noncustodial parent, there is no allegation that he was subject to a court order restricting or terminating his parental rights.  Further, although Anthony was unaware that A.L.W. had been taken from her mother and placed in foster care until five months after the fact when he learned of it from a relative (FAC ¶ 53), Anthony had some relationship with A.L.W.  On several occasions, A.L.W. informed the social workers how to find Anthony and she stated that she wanted to visit him. (FAC ¶¶ 49, 51, 52).

---

[1] The Court notes that, addressing prudential standing, the Supreme Court found that Newdow did not have standing to sue because his claim was based on family rights that were in dispute while prosecuting the lawsuit and the lawsuit could have an adverse affect on the person who is the source of the plaintiff's standing.  Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 17 (2004), abrogated by Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 125 (2014).  Having been deprived of the right to bring suit as next friend, Newdow lacked prudential standing to sue.  Elk Grove Unified Sch. Dist., 542 U.S. at 17-18.  In Lexmark, the Supreme Court abrogated Elk Grove Unified Sch. Dist., finding that the zone of interest test, which asks whether a particular class of persons has a right to sue under the substantive statute, does not belong on the prudential standing rubic.  Lexmark Int'l, Inc., 572 U.S. at 127.

Although Defendants argue that the harm is not specific to him, Anthony does have an interest in the safety of his daughter and ensuring that she will not be harmed while in the custody of the state. Further, as her father, Anthony had an interest in where she was placed and was denied the opportunity to obtain custody of A.L.W. when she was removed from her mother. The Court finds Defendants have not demonstrated that Anthony lacks standing as A.L.W.'s father to bring his claims alleging deprivation of his rights under the Fourteenth Amendment. The Court recommends that Defendants' motion to dismiss Anthony's Fourteenth Amendment claims for lack of standing be denied.

**B.      Second Cause of Action**

Defendants move to dismiss Plaintiffs' second cause of action alleging violation of due process based on placing A.L.W. in her first foster home and placing A.L.W. in Anthony's home arguing that the claim fails as a matter of law.

Generally, the Fourteenth Amendment "does not impose a duty on [the state] to protect individuals from third parties." Patel v. Kent Sch. Dist., 648 F.3d 965, 971 (9th Cir. 2011) (quoting Morgan v. Gonzales, 495 F.3d 1084, 1093 (9th Cir. 2007)). There are two exceptions to the general rule. First, a "special relationship" exception exist[s] where there is a custodial relationship between the plaintiff and the State such that the State has assumed some responsibility for the plaintiff's safety and well-being. Henry A. v. Willden, 678 F.3d 998, 1000 (9th Cir. 2012) (citing Patel, 648 F.3d at 971). "The special-relationship exception does not apply when a state fails to protect a person who is not in custody." Patel, 648 F.3d at 972. Second, a "state-created danger exception" exists where "the state affirmatively places the plaintiff in danger by acting with 'deliberate indifference' to a 'known and obvious danger[.]' " Henry A., 678 F.3d at 998 (quoting Patel, 648 F.3d at 971-72). Where either of these exceptions apply, the state's omission or failure to protect may give rise to a claim under section 1983. Henry A., 678 F.3d at 998

A foster child has a liberty interest protected by substantive due process in social worker supervision and protection from harm inflicted while in the foster care system. Tamas v. Dept. Soc. & Health Servs., 630 F.3d 833, 842 (9th Cir. 2010); Henry A., 678 F.3d at 1000; Taylor By

& Through Walker v. Ledbetter, 818 F.2d 791, 795 (11th Cir. 1987); Doe v. New York City Dep't of Soc. Servs., 649 F.2d 134, 141 (2d Cir. 1981). "Once the state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care. . . ." Tamas, 630 F.3d at 842 (quoting Lipscomb v. Simmons, 962 F.2d 1374, 1379 (9th Cir.1992)). It is the "quintessential responsibility of the social workers assigned to safeguard the well-being of this helpless and vulnerable population." Tamas, 630 F.3d at 843.

In this instance, Plaintiffs are attempting to raise both the special-relationship and the state created danger exceptions. Plaintiffs allege that Defendants Renzi, Kelley, and Rocha were obligated to protect A.L.W. from abuse inflicted by others and that they knew or suspected that the foster home in which they placed her was dangerous. Plaintiffs contend that Defendants had a duty to investigate the foster child's background and eligibility for placement and they did not properly and reasonably evaluate, screen, train, certify, license, and supervise the social workers, foster children, or foster family to ensure that it was a proper placement. Plaintiffs also argue that A.L.W. had a history of sexually deviant behavior and was a danger to minors such as A.W. Plaintiffs contend that Defendants Renzi, Kelley, and Rocha failed to address A.L.W.'s sexually deviant behavior and placed A.W. in harm's way by placing A.L.W. in Anthony's home.

### 1. Placing A.L.W. in Foster Home Where She Observed Sexual Misconduct

Plaintiffs argue that the allegations that A.L.W. suffered sexual misconduct at the hands of her foster mother's daughter and that Defendants were aware and suspected that this home would be a danger to A.L.W. are sufficient to meet the Twombly-Iqbal pleading standards.

"To violate due process, state officials must act with such deliberate indifference to the liberty interest that their actions 'shock the conscience.' " Tamas, 630 F.3d at 844 (quoting Brittain v. Hansen, 451 F.3d 982, 991 (9th Cir.2006)). Conduct that "shocks the conscience" is "deliberate indifference to a known or so obvious as to imply knowledge of, danger." Tamas, 630 F.3d at 844 (quoting Kennedy v. City of Ridgefield, 439 F.3d 1055, 1064 (9th Cir.2006)). Deliberate indifference "requires a showing of an objectively substantial risk of harm and a showing that the officials were subjectively aware of facts from which an inference could be

drawn that a substantial risk of serious harm existed and that either the official actually drew that inference or that a reasonable official would have been compelled to draw that inference." Tamas, 630 F.3d at 845. "Deliberate indifference is 'a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.' " Patel, 648 F.3d at 974 (quoting Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 410 (1997)). "[T]he subjective component may be inferred 'from the fact that the risk of harm is obvious.' " Tamas, 630 F.3d at 845 (quoting Hernandez ex rel. Hernandez v. Texas Dep't of Protective & Regulatory Servs., 380 F.3d 872, 881 (5th Cir.2004)).

Although Plaintiffs argue that sexual misconduct does not occur in a vacuum and that it was likely that the biological daughter of the foster mother had previously been a victim of sexual molestation or had sexually molested other children, there are no facts alleged in the complaint that Defendants had previously been aware of any such conduct in the foster home. Deliberate indifference is established by "(1) 'a showing of an objectively substantial risk of harm'; and (2) 'a showing that the officials were subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm existed' and (a) 'the official actually drew that inference' or (b) 'that a reasonable official would have been compelled to draw that inference.' " Henry A., 678 F.3d at 1001 (quoting Tamas, 630 F.3d at 845). To survive a motion to dismiss, Plaintiffs claims must be facially plausible, which requires sufficient factual detail to allow the Court to reasonably infer that each named defendant is liable for the misconduct alleged. Iqbal, 556 U.S. at 678-79; Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009). The "sheer possibility that a defendant has acted unlawfully" is not sufficient, and "facts that are 'merely consistent with' a defendant's liability" falls short of satisfying the plausibility standard. Iqbal, 556 U.S. at 678; Moss, 572 F.3d at 969.

Plaintiffs speculation that there was sexual misconduct in the home prior to A.L.W. being placed there is insufficient to demonstrate that Defendants were aware of a risk of harm to A.L.W. at the time that she was placed in the foster home. Although the complaint alleges that A.L.W. was taken by her mother to be examined in September 2015 due to allegations of sexual abuse, the complaint contains no allegations that Defendants were aware of any sexual

misconduct in the foster home prior to A.L.W. being placed there or during her stay in the home. The possibility that sexual misconduct might have occurred at some time prior to A.L.W.'s placement is not sufficient for the Court to reasonably infer that any named defendant was aware of or should have inferred that there was a risk of harm to A.L.W. in the first foster home prior to her placement or while she was there. Iqbal, 556 U.S. at 678-79.

Further, as alleged in the complaint, once it was reported that the conduct had occurred, A.L.W. was removed from the home that same day. Plaintiffs have failed to state a claim that Defendants were aware of a risk of harm to A.L.W. at the time that she was placed in the first foster home or that Defendants failed to adequately respond once they were aware that sexual misconduct had occurred. The Court recommends that Defendants' motion to dismiss be granted as to the claim based on A.L.W.'s placement in the first foster home.

2.  Failing to Inform Anthony of the Sexual Misconduct and Subjecting A.W. to a Risk of Sexual Assault

Plaintiffs' second cause of action is brought against Defendants Renzi, Kelley, and Rocha. Defendants Kelley and Rocha move to dismiss the claim on the ground that A.L.W. has failed to state a claim because the complaint does not state which of the defendants was responsible for allegedly placing her in harms way nor does the complaint allege facts that would inform the defendants of any risk of harm to A.W. by A.L.W. Plaintiffs counter that victims of sexual assault often themselves become aggressors and the failure to warn Anthony allowed both his daughters to be injured by the incident.

To state a claim under section 1983, Plaintiffs must demonstrate that each defendant personally participated in the deprivation of his or her rights. Iqbal, 556 U.S. at 677; Simmons v. Navajo County, Ariz., 609 F.3d 1011, 1020-21 (9th Cir. 2010); Ewing v. City of Stockton, 588 F.3d 1218, 1235 (9th Cir. 2009); Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002). In a section 1983 action, the complaint must allege that every defendant acted with the requisite state of mind to violate underlying constitutional provision. OSU Student Alliance v. Ray, 699 F.3d 1053, 1070 (9th Cir. 2012).

Additionally, "[u]nder Section 1983, supervisory officials are not liable for actions of

subordinates on any theory of vicarious liability." Crowley v. Bannister, 734 F.3d 967, 977 (9th Cir. 2013) (citation and internal quotation marks omitted); Iqbal, 556 U.S. at 676. "A supervisor may be liable only if (1) he or she is personally involved in the constitutional deprivation, or (2) there is 'a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" Crowley, 734 F.3d at 977 (citation and internal quotation marks omitted).

In other words, in a section 1983 action, each defendant is only liable for his or her own misconduct, Iqbal, 556 U.S. at 677, and to state a claim, Plaintiffs must demonstrate that each defendant personally participated in the deprivation of his or her rights, Jones, 297 F.3d at 934. While specific facts are not necessary, the complaint must give defendants fair notice of the claim and the grounds upon which it rests. Erickson v. Pardus, 551 U.S. 89, 93 (2007). Plaintiffs' allegations that refer to all defendants generally are insufficient to provide notice of which defendant Plaintiffs are alleging are liable for any alleged injury. Fortaleza v. PNC Fin. Servs. Grp., Inc., 642 F.Supp.2d 1012, 1019 (N.D. Cal. 2009). For example, Plaintiffs allege that Defendants unlawfully removed A.L.W. from her mother's home. (FAC at ¶ 26.) However, as alleged in the complaint, Defendant Renzi did not become involved in A.L.W.'s case until around the time that A.L.W. was placed in her third foster home (FAC at ¶ 63), and there are no factual allegations to suggest that Defendant Renzi was involved in removing A.L.W. from her mother's custody. Similarly, Plaintiffs allege that Defendants placed A.L.W. in a foster home that they knew was dangerous to A.L.W, (FAC ¶ 116), but again the complaint is devoid of any allegations the Defendant Renzi was involved in A.L.W.'s case at this time or that she played any part in the placement of A.L.W. in her first foster home. Plaintiffs also allege that Defendants knowingly placed A.L.W. in the home of her father without disclosing the sexual misconduct that had occurred in foster care (FAC at ¶ 26), but clearly all the named defendants did not engage in the conduct alleged. For example, there are no allegations in the complaint that Defendants Rocha or Trantham were aware of the alleged incidents in the first foster home or that either defendant was involved in A.L.W.'s case at the time that the decision was made to allow A.L.W. visitation with her father. Therefore, the Court considers the allegations against

the individual defendants.

The first amended complaint alleges that Defendant Rocha met with Defendants Trantham, and Perez and they collectively made the decision to remove A.L.W. from her mother's care and placed her in foster care. (FAC ¶¶ 40-41.) Defendant Rocha acted in concert with Defendants Trantham and Perez in drafting the detention report that was filed with the juvenile court prior to the detention hearing. (Id. at ¶ 42.) Upon removal of A.L.W. on February 23, 2016, Rocha did not question A.L.W. as to the identity of her father or cross check evidence of Anthony's identity in prior child abuse referrals cited in the report. (Id. at ¶ 44.)

Anthony contacted Defendant Renzi on August 21, 2016 after he learned from a relative that A.L.W. had been placed in foster care. (Id. at ¶ 53.) Defendants Renzi and Kelley did not fulfill their due diligence or professional responsibility in properly investigating the sexual abuse incidents as required by the Department of Social Services Manual ("DSSM"). (Id. at ¶¶ 59, 61.) At the time that A.L.W. was placed in her third foster home, Defendant Renzi was her social worker. (Id. at ¶ 63.) Defendant Renzi was the first social worker to question A.L.W. regarding what occurred in the first foster home and A.L.W. informed Defendant Renzi about the sexual misconduct, including witnessing the daughter of her foster mother inserting a barbie doll into her private parts. (Id. at ¶¶ 64-65.) Defendant Renzi told A.L.W. not to tell anyone what had happened at the first foster home. (Id. ¶ 65.) Defendant Renzi did not document this contact with A.L.W. in the system. (Id.)

Defendants Renzi and Kelley did not complete an appraisal needs and services plan prior to placing A.L.W. in her subsequent foster homes as required by the DSSM. (Id. ¶ 66-67.) Defendant Renzi was also required to give A.L.W.'s foster parents a statement of dangerous propensities warning them of A.L.W.'s prior sexual activity and this was not done. (Id. at ¶ 67.) Defendant Renzi spoke with A.L.W. several months later after a supervised visit with her mother and again instructed A.L.W. not to talk about the sexual misconduct incidents and did not document this contact in the system. (Id. at ¶ 69.)

While in her third foster placement A.L.W. received counseling from August 26, 2016 until October 27, 2016, and Defendants Renzi and Kelley did not document in the system or with

the juvenile court or report to A.L.W.'s parents why A.L.W. required the level of services she was receiving. (Id. at 70.) On August 8, 2016, Defendant Renzi noted in the system that she had instructed A.L.W. not to tell her mother that she had contact with and was visiting Anthony. (Id. at 71.) On October 12, 2016, A.L.W.'s mother made a formal complaint against Defendant Renzi to her supervisor, Defendant Kelley, about the handling of the case. (Id. at 72.) On October 13, 2016, Defendant Renzi submitted a report to the juvenile judge stating that she could not support placing A.L.W. in Anthony's care without documenting any assessment of Anthony or his home. (Id. at ¶ 73.)

In a report dated November 15, 2016, Defendants Renzi and Kelley stated that the reason for A.L.W.'s therapy was for her to be open in sharing her fears and anxiety and to overcome her need to please and provided fictious dates in the report to cover up their non-compliance with mandated contacts as required by the Department of Social Services regulations. (Id. at ¶ 75.) Defendants Renzi and Kelley were A.L.W.'s assigned social workers and were required to diligently monitor A.L.W.'s placement in foster care. (Id. at ¶ 76.) On February 16, 2017, Anthony was introduced to his new social worker by Defendant Kelley. (Id. at ¶ 78.)

Although Plaintiffs allege that Defendant Kelley was A.L.W.'s social worker along with Defendant Renzi, Plaintiffs claims against Defendant Kelley appear to be solely based on her supervisory role within the department. (FAC ¶¶ 13, 72, 78.) All alleged contact with A.L.W. was by Defendant Renzi, who Plaintiffs contend did not document the contact. There are no allegations in the complaint that demonstrate any personal involvement by Defendant Kelley other than as her role as a supervisor within CSA. As supervisory officials are not liable under section 1983 for actions of subordinates on a theory of vicarious liability, Crowley, 734 F.3d at 977; Iqbal, 556 U.S. at 676, Plaintiffs have failed to state a claim against Defendant Kelley based on placement of A.L.W. in her first foster home or upon custody being granted to her father.

Similarly, although, Plaintiffs allege that Defendant Perez met with A.L.W.'s mother in October 2015 in investigating the allegations of sexual abuse, the only other allegation is that he was involved in the decision to remove A.L.W. from her mother's home and place her in foster care and assisted in drafting the detention report that was filed with the juvenile court. There are

no allegations that Defendant Perez continued to be involved in Plaintiffs' case after A.L.W.'s initial placement in foster care, that he had any knowledge of what occurred in the first foster placement or had any role in the decision to place A.L.W. in Anthony's home. Plaintiffs have failed to state a claim against Defendant Perez based on the placement of A.L.W. in her first foster home or upon custody being granted to her father.

Plaintiffs allege that CSA first became involved with A.L.W. when her mother took her to the hospital in September 2015 to have her examined regarding allegations of sexual abuse. (FAC ¶ 30.) However, despite the allegations and an investigation, A.L.W. continued to live with her mother until February 3, 2016, when the police were called because Plaintiff's mother was arguing with her boyfriend. (Id. at 33.) At that time, the police determined that there was no basis to place A.L.W. in protective custody and referred the matter to CSA. (Id.) It was after this that Defendant Trantham went to A.L.W.'s school to interview her and A.L.W. was removed from her mother's custody on February 23, 2016. (Id. at 35-41.) Despite the allegations that "Defendants" were aware that A.L.W. was sexually abused, there are no allegations that such a finding was made. The fact that an examination was conducted is not sufficient for the Court to reasonably infer that the social workers were aware that A.L.W. had been sexually abused, nor are there any factual allegations in the complaint that such abuse did occur.

The first amended complaint only alleges that A.L.W. was examined in 2015 for sexual abuse and that after she was removed from her mother's custody A.L.W. witnessed sexual misconduct by the daughter of her foster parent in her first foster placement. Even accepting such allegations as true, there are no facts alleged in the complaint by which that Court can reasonably infer that Defendants Kelley and Rocha were aware of a risk of harm to A.L.W. or A.W. and failed to respond appropriately. As to the initial sexual abuse allegations, A.L.W.'s mother was aware of the allegations and took her for a medical examination. (FAC ¶ 30.) While Plaintiffs allege that A.L.W. suffered sexual abuse in the first foster home, the factual allegations in the complaint state that there was inappropriate sexual activity by the daughter of the foster mother. (FAC ¶ 56, 57, 65.) This alone is insufficient for the Court to infer that the social workers should have been aware that there was a substantial risk that A.L.W. would sexually

molest another child. Finally, A.L.W. was provided with counseling from August 26, 2016 to October 27, 2016, prior to the commencement of overnight visits in Anthony's home. (FAC ¶¶ 70, 80.)

For these reasons, the Court finds that Plaintiffs have failed to state a claim against Defendants Kelley and Rocha and recommends that Defendants' Kelley and Rocha's motion to dismiss be granted on the claim that they failed to inform Anthony of the sexual misconduct and allowed A.L.W. to live in her father's home.

### 3. Remaining Theories of Liability for Violations of Due Process

In the first amended complaint, Plaintiffs allege that Defendants Rocha, Renzi, and Kelley violated due process by conspiring together to cause A.L.W. to be subjected to unlawful medical examinations and failing to take action to address A.L.W.'s conduct. Plaintiffs also allege that Defendants Renzi, Kelley, Rocha and Laster[2] seized and interrogated A.L.W. at her school in violation of her rights under the Fourteenth Amendment.[3] Defendants have not moved to dismiss, nor have Plaintiffs addressed, these alleged violations of due process. Absent argument from the parties on the issue, the Court makes no finding as to whether these allegations are sufficient to state a claim. The second cause of action on these theories of liability remain against Defendants Kelley and Rocha.

### C. Third Cause of Action

Defendant Kelley moves to dismiss the third cause of action arguing she is entitled to absolute immunity on the claims that the documents filed with the court contained false information. Further, Defendant Kelley argues that the first amended complaint fails to allege what information was false as to Defendant Kelley. Plaintiffs counter that Defendant is not

---

[2] Although the first amended complaint references "Defendant" Laster, there are no claims pled against Ms. Laster and she has not been named as a defendant in this action.

[3] While the Court does not address the viability of this clam, Plaintiffs are advised that "where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing a plaintiff's claims." Patel v. Penman, 103 F.3d 868, 874 (9th Cir. 1996) (citations, internal quotations, and brackets omitted) overruled on other grounds by Unitherm Food Systems, Inc. V. Swift –Eckrick, Inc., 546 U.S. 394 (2006); County of Sacramento v. Lewis, 523 U.S. 833, 842 (1998). In any amended complaint, Plaintiffs should consider that the Fourth Amendment provides the explicit source of constitutional protection against unlawful search and seizure.

entitled to absolute immunity because she was not fulfilling quasi-prosecutorial decisions. Plaintiffs argue that the complaint contains sufficient facts to support the claim because it is alleged that Defendant Renzi submitted a report stating that she would not support placing A.L.W. with Anthony based on her assessment but that no assessment was performed. Defendants reply that since the complaint alleges that Anthony obtained custody of A.L.W. the complaint is a victim of inconsistent pleading and regardless none of the moving Defendants have been alleged to have made false statements or reports.

### 1. Absolute Immunity

"Absolute immunity is generally accorded to judges and prosecutors functioning in their official capacities".  Olsen v. Idaho State Bd. Of Medicine, 363 F.3d 916, 922 (9th Cir. 2004)  In determining absolute immunity, the court examines "the nature of the function performed, not the identity of the actor who performed it."  Kalina v. Fletcher, 522 U.S. 118, 127 (1997) (quoting Forrester v. White, 484 U.S. 219, 229 (1988)).

"Absolute immunity is extended to state officials, such as social workers, when they are performing quasi-prosecutorial and quasi-judicial functions."  Tamas, 630 F.3d at 842; see also Hardwick v. Cty. of Orange, 844 F.3d 1112, 1115 (9th Cir. 2017) (social workers entitled to absolute immunity for quasi-prosecutorial or quasi-judicial functions in juvenile dependency court); Caldwell v. LeFaver, 928 F.2d 331, 333 (9th Cir.1991) ("quasi-prosecutorial functions" are actions "where a social worker contributes as an advocate to an informed judgment by an impartial decisionmaker").  "However, social workers are not afforded absolute immunity for their investigatory conduct, discretionary decisions or recommendations."  Tamas, 630 F.3d at 842; see also Beltran v. Santa Clara Cty., 514 F.3d 906, 908 (9th Cir. 2008) (social workers "are not entitled to absolute immunity from claims that they fabricated evidence during an investigation or made false statements in a dependency petition affidavit that they signed under penalty of perjury, because such actions aren't similar to discretionary decisions about whether to prosecute").  Deciding to license a foster family or to place or leave a child in the home are traditional investigation and placement responsibilities assumed by social agencies that are not entitled to absolute immunity.  Tamas, 630 F.3d at 842; Miller v. Gammie, 335 F.3d 889, 898

(9th Cir.2003) (absolute immunity does not apply to "decisions and recommendations as to the particular home where a child is to go or as to the particular foster parents who are to provide care").

"The factor that determines whether absolute immunity covers a social worker's activity or 'function' under scrutiny is whether it was investigative or administrative, on one hand, or part and parcel of presenting the state's case as a generic advocate on the other." Hardwick, 844 F.3d at 1115. Absolute immunity only applies where the social worker is presenting the state's case as a generic advocate. Id.

Here, Plaintiffs allege that Defendants Renzi and Kelley did not report to the juvenile judge that A.L.W. required mental health services due to sexual misconduct. (FAC ¶ 70.) On October 13, 2016, Defendant Renzi submitted a report to the juvenile judge after being ordered to assess Anthony's home stating that an assessment had been done and she could not support placing A.L.W. in his home; although there was no documentation that an assessment had been done. (Id. at ¶ 73.) In a six-month report, dated November 15, 2016, Defendants Renzi and Kelley stated that the basis of A.L.W.'s therapy was for her to be open and sharing in her fears and anxiety and to overcome her need to please. (Id. at ¶ 75.) Defendants Renzi and Kelley also provided fictious dates in the report to cover up non-compliance with mandated contacts as required by the Department of Social Services regulations. (Id.) Plaintiffs allege that their due process rights were violated by the filing of false reports with the court. (Id. at ¶ 141.)

Plaintiffs allege that Defendants Renzi and Kelley included false information, not in presenting the state's evidence in support of the dependency petition, but in reports submitted to the court during the dependency proceedings. These reports would not be the type of advocacy in the proceedings that would be entitled to absolute immunity. Plaintiffs allege that the false statements were made in a report assessing Anthony's request to obtain custody of A.L.W. and in periodic review reports submitted to the court. These are the types of investigative and administrative submissions for which social workers would not be entitled to absolute immunity. Costanich v. Dep't of Soc. & Health Servs., 627 F.3d 1101, 1109 (9th Cir. 2010) ("[A]s prosecutors and others investigating criminal matters have no absolute immunity for their

investigatory conduct, a fortiori, social workers conducting investigations have no such immunity.").

The Court finds that Defendant Kelley is not entitled to absolute immunity for the conduct alleged in the third cause of action.

### 2.    Judicial Deception

Under certain circumstances, a plaintiff may state a claim against a social worker for deliberately fabricating evidence during an investigation or deliberately or recklessly making false statements in petitions signed under penalty of perjury and filed with dependency courts when a liberty or property interest is at stake. Costanich, 627 F.3d at 1113–14; Beltran, 514 F.3d at 908; Hardwick, 844 F.3d at 1115–16. To sustain a deliberate fabrication of evidence claim under section 1983, the Ninth Circuit has held that a plaintiff must, "at a minimum, point to evidence that supports at least one of the following two propositions: (1) Defendants continued their investigation of [plaintiff] despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." Costanich, 627 F.3d at 1111 (quoting Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir.2001)). However, "mere allegations that Defendants used interviewing techniques that were in some sense improper, or that violated state regulations, without more, cannot serve as the basis for a claim under § 1983." Devereaux, 263 F.3d at 1075. A "careless or inaccurate investigation that does not ensure an error-free result does not rise to the level of a constitutional violation." Costanich, 627 F.3d at 1111 (quoting Devereaux, 263 F.3d at 1076-77).

At the April 3, 2019 hearing, Plaintiffs confirmed that the judicial deception claim is based on Defendant Renzi's representation to the juvenile court that she had assessed Anthony regarding placement of A.L.W. but there was no assessment made. Here, A.L.W. and Anthony have a liberty interest in familial association that is protected by due process. Lassiter, 452 U.S. at 27; Stanley, 405 U.S. at 651; Santosky, 455 U.S. at 753. The decisions to keep A.L.W. in foster care and whether to grant custody to her father implicate that interest.

Plaintiffs allege that Defendant Renzi did not assess Anthony's home but reported to the

court that she had and recommended against granting custody to Anthony. An investigator who purposely reports that an investigation was conducted when it was not deliberately fabricates evidence. Costanich, 627 F.3d at 1111. However, while Plaintiffs' allegations state a claim against Defendant Renzi, here, the Court is considering whether the allegations in the complaint are sufficient to state a claim against Defendant Kelley.

As previously discussed, Plaintiffs have not alleged any facts that would support a reasonable inference that Defendant Kelley is being held liable on any basis other than supervisory liability. While Plaintiffs allege that Defendant Kelley, in concert with Defendant Renzi, submitted reports to the juvenile court, there are no facts alleged that would indicate that Defendant Kelley was aware that any of the information in the reports was false at that time that they were submitted to the court. Specifically, Plaintiffs' allege that Defendant Renzi did not enter notes regarding her contact with A.L.W. into the system and all the factual allegations indicating knowledge of the sexual misconduct apply to Defendant Renzi. Even if Defendant Kelley's name was on the reports that were submitted to the juvenile court there are no allegations to support that Defendant Kelley deliberately fabricated evidence during an investigation or deliberately or recklessly made false statements in petitions signed under penalty of perjury and filed with the dependency court. Costanich, 627 F.3d at 1113–14.

The Court finds that Plaintiffs' have failed to state a claim against Defendant Kelley based on the petitions and reports filed with the juvenile court and recommends that Defendant Kelley's motion to dismiss the judicial deception claim be granted.

### D. Monell Claim

Plaintiffs fourth[4] cause of action is a Monell claim against the County. Defendants contend the allegations in the complaint arise out of a single incident which is not sufficient to allege a custom or policy and that other alleged violations are based on state law which would not rise to a constitutional violation. Plaintiffs counter that the first amended complaint adequately alleges that Defendants failed to train, disciple, or supervise and violations of

---

[4] Defendants refer to this as the fifth cause of action. However, there is no fifth cause of action alleged in the first amended complaint.

unconstitutional interviews, failures to warn Plaintiffs of the dangers of potential sexual misconduct, and efforts to conceal or fabricate information regarding the case file and investigation. Plaintiffs also contend that the complaint alleges that multiple social workers interviewed A.L.W. without her parents' consent or a warrant which demonstrates a pattern and practice. Defendants reply that, to the extent that Plaintiffs are basing their claim on state-based procedure, the Court should reject Plaintiff's arguments. Defendants argue that insufficient facts have been alleged to place them on notice of the constitutional violations for the purpose of Monell.

A local government unit may not be held responsible for the acts of its employees under a *respondeat superior* theory of liability. Monell v. Department of Social Services, 436 U.S. 658, 691 (1978). A municipality can only be held liable for injuries caused by the execution of its policy or custom or by those whose edicts or acts may fairly be said to represent official policy. Monell, 436 U.S. at 694. Generally, to establish municipal liability, the plaintiff must show that a constitutional right was violated, the municipality had a policy, that policy was deliberately indifferent to plaintiff's constitutional rights, and the policy was "the moving force" behind the constitutional violation. Bd. of Cty. Comm'rs of Bryan Cty., Okl., 520 U.S. at 400; Burke v. County of Alameda, 586 F.3d 725, 734 (9th Cir. 2009); Gibson v. County of Washoe, Nev., 290 F.3d 1175, 1185-86 (9th Cir. 2002). "The custom or policy must be a 'deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.' " Castro v. Cty. of Los Angeles, 833 F.3d 1060, 1075 (9th Cir. 2016) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986)). The deliberate indifference standard for municipalities is an objective inquiry. Castro, 833 F.3d at 1076.

"A plaintiff may []establish municipal liability by demonstrating that (1) the constitutional tort was the result of a 'longstanding practice or custom which constitutes the standard operating procedure of the local government entity;' (2) the tortfeasor was an official whose acts fairly represent official policy such that the challenged action constituted official policy; or (3) an official with final policy-making authority 'delegated that authority to, or

ratified the decision of, a subordinate.' " Price v. Sery, 513 F.3d 962, 966 (9th Cir. 2008)

(quoting Ulrich v. City & County of San Francisco, 308 F.3d 968, 984–85 (9th Cir.2002)).

Plaintiffs allege that the County violated their rights through

unlawful customs, practices and habits of improper and inadequate hiring, training, retention, discipline and supervision of its investigators, employees, mentioned herein, proximately causing the Constitutional deprivations, injuries and damages suffered by PLAINTIFFS as alleged herein.  This includes but is not limited to interrogating A.L.W. at school, willfully removing A.L.W. from her home and the care of her mother, without proper legal basis, and communicating false information to the Juvenile Court.

(FAC ¶ 147.)

### 1.    Unconstitutional Policies

A plaintiff seeking to impose liability upon a municipality is required to identify the policy or custom that caused the constitutional injury.  Bd. of Cty. Comm'rs of Bryan Cty., Okl., 520 U.S. at 403.  A municipality may only be held liable for those deprivations that result "from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality."  Id. at 403–04.  "Similarly, an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."  Id. at 404.

Plaintiffs argue that they have a alleged a series of constitutional violations beyond single individuals or incidents that show constitutional violations.  However, the Supreme Court has distinguished between those cases which present no difficult questions of fault and causation and those that do.  Bd. of Cty. Comm'rs of Bryan Cty., Okl., 520 U.S. at 404.  Plaintiffs are not alleging that a final policymaker instituted an official policy or that there was ratification of the unconstitutional conduct of its employees but that there were unofficial policies in place that violated their constitutional rights.  It has been "long recognized that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.' "  City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988).

"Where a plaintiff claims that the municipality has not directly inflicted an injury, but

nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." Bd. of Cty. Comm'rs of Bryan Cty., Okl., 520 U.S. at 405. Where a cause of action has been recognized based on a single decision attributable to the municipality there must be evidence that the municipality acted and the plaintiff suffered a deprivation of federal rights along with proving fault and causation. Id. at 406. In these cases, the decisions of the final decisionmaker were attributable to the municipality and could establish liability. Id.; see also City of St. Louis, 485 U.S. at 123 (an unconstitutional policy can be inferred from a single decision taken by officials responsible for implementing municipal policy but not from a single unconstitutional action by an employee).

However, cases where there is no allegation that the municipality itself violated federal law or directed or authorized the deprivation of federal rights present more more difficult problems. Bd. of Cty. Comm'rs of Bryan Cty., Okl., 520 U.S. at 406. "That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the employee acted culpably." Id. at 406–07; see City of St. Louis, 485 U.S. at 130 (decision cast in form of policy by a supervisory employee would not establish custom and policy unless a supervising policy maker was aware of the policy and expressly approved it or the decision maker was aware of a series of actions that manifested a custom or policy). The Court considers this distinction in addressing Plaintiffs' claims against the County.

Plaintiffs identify the following "customs, practices, and policies."

a. the custom and practice of detaining and/or removing children from their family and homes without exigent circumstances (imminent danger of serious bodily injury), court order and/or consent;
b. the custom and practice of removing and detaining children, and continuing to detain them for an unreasonable period after any alleged basis for detention is negated;
c. the custom and practice of using trickery, duress, fabrication and/or false testimony and/or evidence, and in failing to disclose evidence, in preparing and presenting reports and court documents to the Court, causing an interference with parental rights, including those as to familial relations;
d. the custom and policy of acting with deliberate indifference in implementing a policy of inadequate training and/or supervision, and/or by failing to train and/or supervise its officers, AGENTS, employees and state actors, in providing the

constitutional protections guaranteed to individuals, including those under the First, Fourth and Fourteenth Amendments, when performing actions related to child abuse and dependency type proceedings;

e. the custom, policy, and/or practice of causing minor children to be interviewed at school without Court Order, parental consent, or parental knowledge.

f. the policy of retaliating against individuals who exercise their constitutional right including to object to, refuse, and/or complain about the actions of the COUNTY, CSA, and/or their social workers;

g. the policy of causing medical examinations, treatment and/or procedures of a minor child without the knowledge, consent, presence and/or authorization of the parent(s) or legal guardians, and without exigency (imminent danger of serious bodily harm), without medical need or urgency, and without valid court order (including without proper application, notice and opportunity to be heard, and due process to their parents);

h. the policy of not allowing children and parents to have a parent present at their minor child's medical procedures, including physical examinations and/or treatment;

i. the policy, custom, and practice of not searching for absent parents and completely ignoring/excluding them from Dependency cases.

(FAC ¶ 167.)

Plaintiffs allege that four different social workers went to A.L.W.'s school on three different occasions to interview her or interviewed her without parental consent in violation of her Fourth Amendment rights. (FAC ¶¶ 31, 36, 94.) These incidents occurred in 2015, 2016, and 2018. Given the number of instances and the time period over which they occurred, the Court finds that these allegations are sufficient to infer that the agency had a policy of interviewing children without the parents' consent or a warrant. Courts have found that in certain circumstances a social worker's interview of a child during a child abuse investigation can constitute a violation of the Fourth Amendment. Dees v. Cty. of San Diego, 302 F.Supp. 3d 1168, 1180 (S.D. Cal. 2017); Olvera v. Cty. of Sacramento, 932 F.Supp.2d 1123, 1136-38 (E.D. Cal. 2013); Williams v. Cty. of San Diego, No. 17CV815-MMA (JLB), 2017 WL 6541251, at *6 (S.D. Cal. Dec. 21, 2017). Plaintiffs have stated a claim against the County based on the allegations of interviewing children without parental consent or a warrant in violation of the Fourth Amendment.

However, the remainder of Plaintiffs' claims of policy or custom fail to state a claim as Plaintiffs have not alleged sufficient facts beyond those of a single incident or the actions of a single employee of the County. For example, Plaintiffs allege that the County had a "practice of detaining and/or removing children from their family and homes without exigent circumstances

(imminent danger of serious bodily injury), court order and/or consent." However, "[l]iability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996). Here there is a single incident alleged in the complaint, the removal of A.L.W. from her mother. While Plaintiffs allege that the removal of A.L.W. was unlawful, and argued at the April 3, 2019 hearing that Mr. Garrett said that Defendant Renzi had improperly removed children from their parents which shows knowledge by the County, there is no indication of when the County became aware of any issues with Defendant Renzi. Mr. Garratt's statements were made around February 16, 2017, well after the removal of A.L.W. from her mother's custody. To the extent that Plaintiffs attempt to infer that the County ratified the actions of Defendant Renzi, there are no allegations that support an inference that the County was aware of the issues prior to Mr. Garrett being brought in to "clean up the mess" and failed to act. The allegations in the first amended complaint do not support more than isolated or sporadic incidents of allegedly unlawful removal that are insufficient to allege a custom or practice exists within the County.

Similarly, Plaintiffs allege a "custom and practice of using trickery, duress, fabrication and/or false testimony and/or evidence, and in failing to disclose evidence, in preparing and presenting reports and court documents to the Court, causing an interference with parental rights, including those as to familial relations." However, the only allegations of deception relate to a single employee, Defendant Renzi. Even accepting as true that Defendant Renzi did the acts alleged in the complaint, it does not lead to a reasonable inference that this was a custom in the County. The County cannot be held liable on the basis of culpable conduct of an employee. Bd. of Cty. Comm'rs of Bryan Cty., Okl., 520 U.S. at 406-07. Plaintiffs have not alleged any other incidents where an employee other than Defendant Renzi fabricated or presented false evidence in a juvenile dependency case that would support a policy or custom claim against the County.

Plaintiffs also allege that the County had a custom or policy of causing medical examination and treatment without parental consent and not having parents present during treatment. The only medical treatment alleged in the complaint is on September 26, 2015, when

A.L.W's mother took her for a medical examination. (FAC ¶ 30.) Although Plaintiffs allege on information and belief that A.L.W. had other medical examinations during her time in foster care, there are no allegations by which the Court can reasonably infer that the County conducted investigatory or dual-purpose medical examinations in violation of the A.L.W. or her parents' constitutional rights. See Wallis v. Spencer, 202 F.3d 1126, 1142 (9th Cir. 2000) (parents have a right to be with their children while they are receiving medical care and "children have a corresponding right to the love, comfort, and reassurance of their parents while they are undergoing medical procedures, including examinations . . . that are invasive or upsetting."); Mann v. Cty. of San Diego, 907 F.3d 1154, 1160–62 (9th Cir. 2018) (The state violates the parents' substantive due process rights by performing investigatory or dual purpose "medical examinations without notifying the parents about the examinations and without obtaining either the parents' consent or judicial authorization.")

Plaintiffs also allege that the County has a policy, custom or practice of not searching for absent parents and completely ignoring them in dependency cases. However, again Plaintiffs' allegations are solely based on the dependency proceedings for A.L.W. and there are no factual allegations that this conduct occurred in any other case. Therefore, Plaintiffs allegations are not sufficient to show such a custom or policy. Trevino, 99 F.3d at 918.

2.      Failure to Train or Supervise

"A municipality's failure to train or supervise its employees can be an unconstitutional 'policy' for purposes of § 1983 liability." Pauls v. Green, 816 F.Supp.2d 961, 970 (D. Idaho 2011). A municipality can be held liable under section 1983 for its failure to train or supervise employees that result in constitutional violations where the failure amounts to deliberate indifference to the rights of the individuals with whom the employee comes into contact. City of Canton, Ohio v. Harris, 489 U.S. 378, 380 (1989); Long v. Cty. of Los Angeles, 442 F.3d 1178, 1186 (9th Cir. 2006); Anderson v. Warner, 451 F.3d 1063, 1070 (9th Cir. 2006).

"To allege municipal liability under § 1983 for failure to train or supervise, Plaintiff must show "(1) that [he or she] possessed a constitutional right of which he was deprived; (2) that the [County] had a policy; (3) that the policy 'amounts to deliberate indifference' to [his or her]

constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.' " Anderson, 451 F.3d at 1070; Merritt v. Cty. of Los Angeles, 875 F.2d 765, 770 (9th Cir. 1989)). Deliberate indifference on the part of a municipality may be established where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Merritt, 875 F.2d at 770 (quoting City of Canton, 489 U.S. at 390); see also Flores v. Cty. of Los Angeles, 758 F.3d 1154, 1159 (9th Cir. 2014) (under the deliberate indifference standard plaintiff must allege facts to show that the defendant "disregarded the known or obvious consequence that a particular omission in their training program would cause [municipal] employees to violate citizens' constitutional rights.") The Ninth Circuit has held that the same standards apply to claims of inadequate supervision. Davis v. City of Ellensburg, 869 F.2d 1230, 1235 (9th Cir. 1989).

"[T]he existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the [employee] involved in a particular incident, is the 'moving force' behind the plaintiff's injury." Bd. of Cty. Comm'rs of Bryan Cty., Okl., 520 U.S. at 407–08. Here, other than a general reference to failure to train or supervise, Plaintiffs have not alleged that there is an inadequate training program or that a training program does not exist nor does the first amended complaint allege any facts to demonstrate a failure to supervise. Further, there are no facts to show that the County was deliberately indifferent to the need to train or supervise subordinates and that the lack of training or supervision caused a constitutional violation. Without allegations of specific shortcomings in the training or supervision or facts that might place the County on notice that constitutional deprivations were likely to occur, Plaintiffs have not adequately pled a § 1983 claim for failure to train or supervise. Hyun Ju Park v. City & Cty. of Honolulu, 292 F.Supp.3d 1080, 1099 (D. Haw. 2018); Bini v. City of Vancouver, 218 F.Supp.3d 1196, 1203 (W.D. Wash. 2016). Plaintiffs have failed to allege a claim against the County based on failure to train or supervise.

///

### 3. Failure to Discipline

"Where a plaintiff alleges that a municipality's conduct runs afoul of section 1983 for the city's failure to discipline its employees, the claim is understood as one for ratification." Rabinovitz v. City of Los Angeles, 287 F.Supp.3d 933, 967 (C.D. Cal. 2018). To show ratification, a plaintiff must prove that the 'authorized policymakers approve a subordinate's decision and the basis for it.' " Christie v. Iopa, 176 F.3d 1231, 1239 (9th Cir. 1999) (quoting City of St. Louis, 485 U.S. at 127). "We have found municipal liability on the basis of ratification when the officials involved adopted and expressly approved of the acts of others who caused the constitutional violation." Trevino, 99 F.3d at 920. "Ratification requires, among other things, knowledge of the alleged constitutional violation[,] Christie, 176 F.3d at 1239, and generally requires more than acquiescence, Sheehan v. City and County of San Francisco, 743 F.3d 1211, 1231 (9th Cir. 2014). The "plaintiff must prove that the policymaker approved of the subordinate's act." Christie, 176 F.3d at 1239.

Here, although Plaintiffs allege that County employees engaged in conduct that violated their constitutional rights, as discussed above, the amended complaint is devoid of any factual allegations to demonstrate that the County was aware of such misconduct and failed to discipline. Plaintiffs have failed to state a claim against the County based on a failure to discipline.

### 4. Conclusion

Based on the foregoing, the Court finds that Plaintiffs first amended complaint alleges a claim against the County based on on the allegations that social workers interview children without the parents' consent or a warrant in violation of the Fourth Amendment. However, the first amended complaint fails to state any other cognizable Monell claims against the County. The Court recommends that Defendant County's motion to dismiss the Monell claim be denied as to the claim that there is a policy of interviewing minors without parental consent and granted in all other respects.

### E. Intentional Infliction of Emotional Distress

Defendants move to dismiss the intentional infliction of emotional distress claim on the

ground that it is not clear which Defendants the claim is asserted against or which conduct is alleged to have caused the intentional infliction of emotional distress. Plaintiffs counter that the claim states that it is brought against Defendants County and Renzi and they have outlined sufficient facts to state a claim. Defendants reply that the shotgun style pleading and the generalized allegations are insufficient to state a claim.[5]

Under California law, the elements of intentional infliction of emotional distress are: "(1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional suffering, and (4) actual and proximate causation of the emotional distress." Wong v. Tai Jing, 189 Cal.App.4th 1354, 1376 (2010) (quoting Agarwal v. Johnson, 25 Cal.3d 932, 946 (1979)). Conduct is "outrageous if it is 'so extreme as to exceed all bounds of that usually tolerated in a civilized community.'" Simo v. Union of NeedleTrades, Industrial & Textile Employees, 322 F.3d 602, 622 (9th Cir. 2002) (quoting Saridakis v. United Airlines, 166 F.3d 1272, 1278 (9th Cir. 1999)). "Generally, conduct will be found to be actionable where the 'recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " Cochran v. Cochran, 65 Cal.App.4th 488, 494 (1998) (quoting KOVR–TV, Inc. v. Superior Court, 31 Cal.App.4th 1023, 1028 (1995)). The emotional distress must be "of such a substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it." Simo, 322 F.3d at 622.

Plaintiff's sixth cause of action is brought against Defendants Renzi and County alleging intentional infliction of emotional distress. Plaintiffs allege that Defendant Renzi is liable for engaging in "(a) the use of duress and undue influence in forcing PLAINTIFFS to submit to their

---

[5] The California Tort Claims Act requires that a tort claim against a public entity or its employees be presented to the California Victim Compensation and Government Claims Board, formerly known as the State Board of Control, no more than six months after the cause of action accrues. Cal. Gov't Code §§ 905.2, 910, 911.2, 945.4, 950-950.2. Presentation of a written claim, and action on or rejection of the claim are conditions precedent to suit. State of California v. Superior Court ("Bodde"), 32 Cal.4th 1234, 1239 (2004); Shirk v. Vista Unified School District, 42 Cal.4th 201, 209 (2007). To state a tort claim against a public employee, a plaintiff must allege compliance with the California Tort Claims Act. Cal. Gov't Code § 950.6; Bodde, 32 Cal.4th at 1239. "[F]ailure to allege facts demonstrating or excusing compliance with the requirement subjects a compliant to general demurrer for failure to state a cause of action." Bodde, 32 Cal.4th at 1239. Plaintiffs have alleged presentation of a claim form in compliance with the Act and Defendants have not challenged the allegation.

demands; (b) by unlawfully removing, and detaining, and continuing the detention of A.L.W.; (c) by investigating and questioning with intimidation, coercion and duress the Plaintiff A.L.W.; (d) by maliciously withholding evidence from the Juvenile Court and parties; (e) by falsely and maliciously alleging and reporting that A.L.W.'s physical health and safety were not threatened; (f) by causing A.L.W. to be physically examined without presence of her parents; and (g) by retaliating against PLAINTIFFS due to their exercise of their rights to free speech to complain about DEFNDANTS' [sic] conduct." (FAC ¶ 157.)

Several of the actions that are alleged to be the basis of the claim for emotional distress do not have factual support in the first amended complaint. For example, Plaintiffs allege that Defendant Renzi used duress and undue influence to force them to submit to her demands. However, the Court finds no factual allegations in the complaint that would support such an allegation. Although the first amended complaint does allege that Defendant Renzi told Plaintiff A.L.W. not to tell about the sexual misconduct that occurred in the first foster home on two occasions and that A.L.W. was frightened by her first response (FAC ¶ 65, 69), the Court cannot reasonably infer from these allegations that Defendant Renzi used duress or undue influence on A.L.W. The only other allegation in the complaint is that Defendant Renzi noted that she had instructed A.L.W. not to disclose to her mother that she was having contact with her father. (FAC ¶ 71.) These allegations do not support Plaintiffs contention that Anthony or A.L.W. were subjected to intimidation or coercion or duress. (FAC ¶ 157(a)(c).) There are no factual allegations in the complaint by which the Court can find a factual basis to support that Defendant Renzi used duress and undue influence to force any plaintiff to submit to her demands or that Defendant Renzi subjected A.L.W. to intimidation, coercion, or duress.

Plaintiffs also allege that Defendant Renzi falsely reported that A.L.W.'s physical health and safety were not threatened. (FAC ¶ 157(e).) However, there is no factual support in the first amended complaint that A.L.W.'s physical health and safety were threatened during the time that Defendant Renzi was her social worker or that Defendant Renzi made such a report to the juvenile court. The only factual allegations that could reasonably be construed as potentially causing a risk of physical harm would be the placement in the first foster home and Defendant

Renzi was not A.L.W.'s social worker at that time, and as discussed above, there are no allegations sufficient to find that anyone at the County was aware of the risk at that time A.L.W. was placed in the home.  See Duronslet v. Cty. of Los Angeles, 266 F.Supp.3d 1213, 1218 (C.D. Cal. 2017) (without a plausible allegation that the defendant knew or should have known that the conduct would result in injury there is no emotional distress claim).  While Plaintiffs allege that during the time that A.L.W. was being monitored by Defendant Renzi there were some reports of abuse or neglect reported to social services, there are no allegations as to what was reported, who made the reports, nor is there any indication that A.L.W.'s physical health or safety were threatened.  The mere allegation that a report was made is insufficient to find that A.L.W.'s physical health or safety were threatened or that Defendant Renzi made a false report to the juvenile court.

Plaintiffs also allege that Defendant Renzi caused A.L.W. to be physically examined without the presence of her parents.  (FAC ¶ 157(f).)  However, even assuming that such an examination occurred, there are no facts alleged that would cause an inference that a social worker having the child medically examined would be outrageous conduct to support a claim of intentional infliction of emotional distress.  "In evaluating whether the defendant's conduct was outrageous, it is 'not enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.  Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Cochran, 65 Cal.App.4th at 496.  Absent more, the Court finds that the allegation that A.L.W. had medical examinations without her parents present is insufficient to support a claim of intentional infliction of emotional distress.

Plaintiffs do allege several bases that have factual support in the complaint.  Plaintiffs allege that Defendant Renzi continued the detention of A.L.W., withheld evidence from the juvenile court and the parties, and retaliated against Plaintiffs for exercising their right to free

speech by complaining about her conduct. (FAC ¶¶ 157(b)(d)(g).) The first amended complaint alleges that Defendant Renzi knew of the sexual misconduct that had occurred in the first foster home and that A.L.W. was receiving counseling due to this. However, Defendant Renzi reported to the juvenile court that A.L.W. was receiving counseling for her to be open to sharing her fears and anxiety and to overcome her need to please when A.L.W. was receiving counseling for the sexual misconduct she observed. Further, Plaintiffs allege that Defendant Renzi was ordered to conduct an investigation into whether Anthony's home was an appropriate placement for A.L.W. and, without conducting such investigation, recommended against A.L.W. being placed with Anthony. Although Defendants argue that A.L.W. was eventually placed with Anthony, she remained in foster care and did not receive overnight weekend visits with Anthony until approximately seven months later and he was not granted custody until a year after Defendant Renzi's recommendation. "Behavior may be considered outrageous if the defendant '(1) abuses a relation or position which gives him power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress." Chaconas v. JP Morgan Chase Bank, 713 F.Supp.2d 1180, 1188 (S.D. Cal. 2010) (quoting Fermino v. Fedco, Inc., 7 Cal.4th 701, 713 (1994)). Plaintiffs are alleging that A.L.W.'s social worker deliberately lied to keep her from being removed from foster care and placed with her father. Plaintiffs' allegations that Defendant Renzi's alleged conduct caused A.L.W. to remain in a foster home longer than would otherwise have occurred is sufficient to support the claim of intentional infliction of emotional distress.

Plaintiffs allege that Defendant Renzi acted intentionally or with reckless disregard to causing emotional distress and that Plaintiffs suffered fright, nervousness, anxiety, worry, mortification, shock, humiliation and indignity. At the pleading stage, California sets a high bar for severe emotional distress. Hughes v. Pair, 46 Cal.4th 1035, 1051 (2009). "Severe emotional distress means 'emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it." Hughes, 4 Cal.4th at 1051 (finding that allegation that plaintiff suffered "discomfort, worry, anxiety, upset stomach,

concern, and agitation" due to defendant's conduct did not comprise "emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it.")  Under <u>Hughes</u>, Plaintiffs allegations are insufficient to state a claim for intentional infliction of emotional distress.

Plaintiffs bring the claim against the County alleging vicarious liability under California Government Code § 815.2.  California Government Code § 815.2(a) provides: "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."  <u>Blanco v. Cty. of Kings</u>, 142 F.Supp.3d 986, 1004 (E.D. Cal. 2015).  However, as Plaintiffs have failed to state an intentional infliction of emotional distress claim, the complaint also fails to state an intentional infliction of emotional distress claim against the County on a theory of vicarious liability.  The Court recommends that the Defendants' motion to dismiss the intentional infliction of emotional distress claim be granted.

### F. Negligence

Defendants contend that Plaintiffs have failed to plead a mandatory as opposed to a discretionary duty to support a negligence claim.  Defendants argue that courts have expressly rejected finding a mandatory duty based on the DSSM sections that are designed to prevent sexual abuse.  Plaintiffs counter that they first amended complaint specifically outlines the duties that were breached through references to the DSSM and also references that specific acts to which they refer.  Plaintiffs contend that by arguing that the DSSM imposes discretionary and not mandatory duties, Defendants are asking the Court to rule on the merits of the case and this is not appropriate on a motion to dismiss.  Defendants reply that Plaintiffs misunderstand the scope of the current motion.  Defendants contend that Plaintiffs are obligated to set forth whether the sections relied on impose mandatory rather than discretionary duties that are intended to protect against the risk of the kind of injury suffered by the plaintiff.

Plaintiffs seventh cause of action alleges negligence against Defendants County, Renzi, Kelley, and Rocha.  Plaintiffs allege that California Government Code section 820.21 creates

liability for social workers and child protectors who conduct investigations and proceedings where certain acts are committed maliciously. (FAC ¶ 164.) Plaintiffs contend that by the acts alleged in the first amended complaint, Defendants County, Renzi, Kelley, and Rocha acted unreasonably and below the applicable standard of care. (FAC ¶ 165.) Plaintiffs contend that the defendants had an affirmative duty of care to exercise reasonable and ordinary care and skill in investigating, documenting, and assessing the Plaintiffs' child welfare circumstances. (FAC ¶ 167.) Plaintiffs allege that Defendants Renzi, Kelley, and Rocha failed to execute their responsibilities as defined by their job classifications. (FAC ¶ 168.) Plaintiffs contend that Defendant Kelley failed to train, supervise, and review the activities of her subordinates as required by her job description and to properly ensure that her subordinates were in compliance with legal requirements. (FAC ¶¶ 169, 170.)

Plaintiffs contend that Defendants were under a mandatory duty not to interfere with Anthony's custody of A.L.W. absent circumstances not present here. (FAC ¶¶ 171, 172.) Plaintiffs allege that the defendants were under "a duty to comply with the regulations and requirements of the Regulations of the California Health and Human Services Agency, Department of Social Services, Child Welfare Services Manual Policies and Procedures" and failed to comply with the regulations. (FAC ¶ 173.) Plaintiffs contend that the County and CSA failed to complete reports and investigation that are required by the DSSM and to ensure that they had authority to remove A.L.W. prior to removal. (FAC ¶¶ 174-178.)

Under California law, a public employee is liable for injury "proximately caused by his negligent or wrongful act or omission." Cal. Gov't Code § 844.6(d). "The elements of a negligence cause of action are: (1) a legal duty to use due care; (2) a breach of that duty; (3) the breach was the proximate or legal cause of the resulting injury; and (4) actual loss or damage resulting from the breach of the duty of care." Brown v. Ransweiler, 171 Cal.App.4th 516, 534 (2009). "A duty of care may arise through statute, contract, the general character of the activity, or the relationship between the parties." The Ratcliff Architects v. Vanir Constr. Mgmt., Inc., 88 Cal.App.4th 595, 604–05 (2001).

"California public entities are not subject to common law tort liability; all liability must

be pursuant to statute." <u>AE ex rel. Hernandez v. Cty. of Tulare</u>, 666 F.3d 631, 638 (9th Cir. 2012); <u>see</u> Cal. Gov. Code § 815 ("Except as otherwise provided by statute: (a) A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person.")  Plaintiffs assert that liability for negligence exists under sections 815.2, 815.6, and 820 of the California Government Code.

Section 815.2 provides that "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."  Cal. Gov. Code § 815.2(a).  Under section 815.6, "[w]here a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."  Cal. Gov. Code § 815.6.  Pursuant to section 820, "a public employee is liable for injury caused by his act or omission to the same extent as a private person."  Cal. Gov. Code § 820(a).  This establishes two ways that a public entity can be liable: "(1) direct liability for breach of a mandatory duty, pursuant to California Government Code § 815.6; and (2) derivative liability for the negligent acts or omissions of County employees, pursuant to California Government Code § 815.2."  <u>AE ex rel. Hernandez</u>, 666 F.3d at 638.

Plaintiffs here are bringing claims against the individual defendants and also against the County based on both direct liability and derivative liability.  In the current motion, the parties only address the direct liability claim against the County.  Therefore, the Court only addresses this direct liability claim.[6]

For a duty to be mandatory "the enactment at issue [must] be obligatory, rather than

---

[6] California courts find that social workers are immune from civil liability, <u>Alicia T. v. Cty. of Los Angeles</u>, 222 Cal.App.3d 869, 882-83 (1990), modified (Aug. 16, 1990), other than those exceptions listed in section 820.21.  <u>See</u> Cal. Gov. Code § 820.21 (social workers are not immune for "(1) Perjury. (2) Fabrication of evidence. (3) Failure to disclose known exculpatory evidence. (4) Obtaining testimony by duress, as defined in Section 1569 of the Civil Code, fraud, as defined in either Section 1572 or Section 1573 of the Civil Code, or undue influence, as defined in Section 1575 of the Civil Code."  However, the parties have not addressed immunity for the individual defendants.

merely discretionary or permissive, in its directions to the public entity; it must require, rather than merely authorize or permit, that a particular action be taken or not taken." State Dep't of State Hosps. v. Superior Court, 61 Cal.4th 339, 348 (2015) (quoting Haggis v. City of Los Angeles, 22 Cal.4th 490, 498 (2000)). "It is not enough, moreover, that the public entity or officer have been under an obligation to perform a function if the function itself involves the exercise of discretion." State Dep't of State Hosps., 61 Cal.4th at 348 (quoting Haggis, 22 Cal.4th at 498.) Additionally, a mandatory duty is found only where the enactment "affirmatively imposes the duty and provides implementing guidelines." Guzman v. County of Monterey, 46 Cal.4th 887, 898 (2009). "[T]he mandatory nature of the duty must be phrased in explicit and forceful language." State Dep't of State Hosps., 61 Cal.4th at 348. "It is not enough that some statute contains mandatory language. To recover, the plaintiffs "have to show that there is some specific statutory mandate that was violated by the [public entity]." Id.

"Whether a particular statute is intended to impose a mandatory duty, rather than a mere obligation to perform a discretionary function, is a question of statutory interpretation for the courts." State Dep't of State Hosps., 61 Cal.4th at 348 (citations omitted); Guzman, 46 Cal.4th at 898 (citations omitted). The court is to examine the " 'language, function and apparent purpose' of each cited enactment 'to determine if any or each creates a mandatory duty designed to protect against' the injury allegedly suffered by plaintiff." Guzman, 46 Cal.4th at 898 (quoting Haggis, 22 Cal.4th at 500.) A public entity's exercise of discretion often marks the dividing line between mandatory duty and one that is not but that line can be difficult to draw. State Dep't of State Hosps., 61 Cal.4th at 348.

Here, Defendants argue that courts have rejected finding that a mandatory duty exists based on sections of the DSSM that are designed to prevent sexual abuse. (ECF No. 34-1 at 9.) However, Plaintiffs have not brought the negligence action based on the DSSM sections addressing sexual abuse, but based on provisions requiring the County to ensure that it had the authority to remove A.L.W. from her home prior to removal; to assess the specific characteristics of A.L.W. and respond to allegations of sexual abuse by conducting an investigation; to perform an investigation for the existence of conditions that could place Plaintiffs at risk of abuse, neglect

or exploitation; and that social workers were required to visit a child three times in the first thirty days and at least once each calendar month and document the contact in the system. (FAC ¶¶ 173-178.) Additionally, Plaintiffs have alleged that Defendants had mandatory duties imposed by the California Welfare and Institutions Codes not to interfere with Anthony's custody of A.L.W. unless certain conditions were met, (FAC ¶ 172), and Defendants have not addressed these alleged mandatory duties.

Courts within California have found that the DSSM imposes a mandatory duty on the county. See Scott v. Cty. of Los Angeles, 27 Cal.App.4th 125, 142 (1994) (DSS regulation requiring monthly visitation is a mandatory duty); All. For Children's Rights v. Los Angeles Cty. Dep't of Children & Family Servs., 95 Cal.App.4th 1129, 1142 (2002) (duty that social workers must visit each dependent child monthly as required by the DSSM is mandatory); Jacqueline T. v. Alameda Cty. Child Protective Servs., 155 Cal.App.4th 456, 477 (2007), as modified (Oct. 4, 2007) (agreeing regulatory language in DSSM required utilizing social workers skilled in emergency response); Katerina P. v. Cty. of Los Angeles, No. B184683, 2006 WL 3479814, at *2 (Dec. 4, 2006) (unpublished) (requirement that social worker visit foster child's home not violated because the child was not placed in foster care); Hudson v. Cty. of Fresno, No. F065798, 2015 WL 5731311, at *12-13 (Sept. 30, 2015) (unpublished) (finding the regulations in chapters 31-100 in the DSSM are quasi legislative and determining whether a mandatory duty is imposed would require examining each regulatory provision.); Angie M. v. Cty. of Los Angeles, No. B193190, 2007 WL 2337696, at *2 (Aug. 17, 2007) (unpublished) (California courts have held that the regulations in the DSSM requiring monthly visitation create a mandatory duty).

Plaintiffs have alleged that A.L.W.'s social workers were required by the DSSM to complete reports and investigation prior to removing her from her mother's custody, to perform investigation into the existence of conditions that could place her at risk, and to visit her and did not comply with these duties. Plaintiffs have sufficiently alleged that a mandatory duty existed and Defendants motion to dismiss the negligence claim should be denied.

///

44

### G. Injunctive Relief

Defendants move to dismiss the claim for injunctive relief on the ground that it is a remedy and not a claim for relief. Plaintiffs counter that they are entitled to injunctive relief because they have pled that A.L.W. continued to be subjected to an unconstitutional interview even after being placed in her father's home. Defendants respond that Plaintiffs misread the authority and that they provide no authority that a single interview is sufficient for prospective relief.

Courts find that it is well settled that a claim for injunctive relief standing alone is not a cause of action. Veridian Credit Union v. Eddie Bauer, LLC, 295 F.Supp.3d 1140, 1156 (W.D. Wash. 2017); Ramos v. Chase Home Fin., 810 F.Supp.2d 1125, 1132 (D. Haw. 2011); Mangindin v. Washington Mut. Bank, 637 F.Supp.2d 700, 709 (N.D. Cal. 2009). "An injunction is a remedy, not a separate claim or cause of action." Jensen v. Quality Loan Serv. Corp., 702 F.Supp.2d 1183, 1201 (E.D. Cal. 2010). While injunctive relief may be available as a remedy if a plaintiff prevails on a cause of action, it is not an independent claim and the Court recommends that the motion to dismiss the claim for injunctive relief without leave to amend be granted.

Defendants seek to dismiss the request for injunctive relief without leave to amend. Defendants appear to be arguing that it is unlikely that A.L.W. would be subject to being interviewed again since Anthony now has custody of A.L.W. At the April 3, 2019 hearing Plaintiffs argue that this could happen again because A.L.W. was subjected to an interview after Anthony had custody. However, Defendants have not provided any legal authority or argument regarding whether injunctive relief would be available in such circumstances nor did they provide argument as to why this would be unlikely to occur again during the April 3, 2019 hearing. As Defendants have not adequately addressed the issue, the Court recommends that Plaintiffs be granted leave to file an amended complaint to add the request for injunctive relief in their prayer for relief.

/ / /

/ / /

/ / /

**V.**

**CONCLUSION AND RECOMMENDATION**

Based on the foregoing, IT IS HEREBY RECOMMENDED that:

1.    Defendants County of Stanislaus, Angela Kelley, Melody Trantham, Salvador Perez, and Anacani Rocha's motion to dismiss, filed January 30, 2019, be GRANTED IN PART AND DENIED IN PART as follows:

    a.    Defendants' motion to dismiss Anthony's due process claims for lack of standing be DENIED;

    b.    Defendants motion to dismiss the claims against Defendants Kelley and Rocha that are based on placing A.L.W. in the first foster home, and failing to inform Anthony of the sexual misconduct and subjecting A.W. to a risk of sexual assault be GRANTED;

    c.    Defendant Kelley's motion to dismiss on the grounds of absolute immunity be DENIED;

    d.    Defendants' motion to dismiss the judicial deception claim against Defendant Kelley be GRANTED;

    e.    County's motion to dismiss the <u>Monell</u> claim based on interviewing children without parental consent or a warrant be DENIED and GRANTED for all other claims;

    f.    Defendants' motion to dismiss the intentional infliction of emotional distress claim be GRANTED;

    g.    Defendants' motion to dismiss the negligence claim be DENIED;

    h.    Defendants' motion to dismiss the claim for injunctive relief be GRANTED; and

2.    Plaintiffs be granted leave to file a second amended complaint.

This findings and recommendations is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304. Within fourteen (14) days of service of this recommendation, any party may file written objections to this

findings and recommendations with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **April 4, 2019**

UNITED STATES MAGISTRATE JUDGE